IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| THE CATHOLIC DIOCESE OF ) | |
| NASHVILLE, et al. ) | |
| ) | |
| v. ) | No. 3:13-01303 |
| ) | JUDGE CAMPBELL |
| ) | |
| KATHLEEN SEBELIUS, et al. ) | |

MEMORANDUM

I. Introduction

Pending before the Court is the Plaintiffs' Motion For Preliminary Injunction (Docket No. 14), the Defendants' Response (Docket No. 41), and the Plaintiffs' Reply (Docket No. 57).[1] The Court held a hearing on the Motion on December 23, 2013. For the reasons stated herein, the Motion For Preliminary Injunction is DENIED.

II. Factual/Procedural Background

This action has been brought by The Catholic Diocese of Nashville ("The Diocese"); Catholic Charities of Tennessee ("Catholic Charities"); Camp Marymount; Mary, Queen of Angels ("MQA"); St. Mary Villa; Dominican Sisters of St. Cecilia Congregation ("The Congregation"); and Aquinas College to challenge certain regulations implementing the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010). (Complaint, Docket No. 1). Plaintiffs allege that they are Catholic religious entities that provide a wide range of spiritual, educational and social services to individuals in Middle Tennessee and

---

[1] The American Civil Liberties Union and American Civil Liberties Union of Tennessee have also filed an *amicus* brief opposing the Plaintiffs' position. (Docket No. 51). Also pending is Defendants' Motion To Dismiss, Or Alternatively, For Summary Judgment (Docket No. 38), which is not fully briefed for decision.

beyond, regardless of whether those individuals are Catholic. (Id.) Plaintiffs allege that they uphold and follow the teachings of the Catholic Church. (Id.) Plaintiffs contend that their sincerely-held religious beliefs dictate that it is unacceptable to provide, pay for, and/or facilitate access to abortion[2], sterilization, or the use of contraception. (Id.) Plaintiffs claim that the ACA and its implementing regulations require them to violate those teachings. (Id.) Plaintiffs base their challenge on the Religious Freedom Restoration Act ("RFRA"); the First Amendment Free Exercise Clause, Free Speech Clause, Establishment Clause, and Religion Clauses; and the Administrative Procedures Act ("APA"). (Id.) Named as Defendants are Kathleen Sebelius, Secretary of the U.S. Department of Health and Human Services; Thomas Perez, Secretary of the U.S. Department of Labor; Jacob J. Lew, Secretary of the U.S. Department of Treasury; U.S. Department of Health and Human Services; U.S. Department of Labor; and U.S. Department of Treasury. (Id.)

Plaintiffs seek to enjoin Defendants from "application or enforcement against Plaintiffs, their employee health plans, participants in their employee health plans, or their third party administrators or insurers of the requirement under 45 C.F.R. § 147.130(a)(1)(iv), corresponding Guidelines, and corresponding press releases that provide coverage for FDA-approved

---

[2] Defendants strongly dispute Plaintiffs' characterization of the contraception services in the ACA as including "abortion." See Administrative Record, at 320 (". . . abortion services were considered to be outside of the project's scope, given the restrictions contained in the ACA."). As Plaintiffs allege in their Complaint, the "Weldon Amendment" to the Consolidated Appropriations Act of 2012 denies funds to any federal, state or local agency, program, or government that "subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions." Pub. L. No. 112-74, § 507(d)(1), 125 Stat. 786, 1111 (Dec. 23, 2011). Because the Plaintiffs do not raise violation of the Weldon Amendment in their preliminary injunction briefs, the Court considers the argument waived for purposes of the preliminary injunction motion.

contraceptive methods, abortion-inducing drugs, sterilization procedures, and patient education and counseling, including the substantive requirement imposed in 42 U.S.C. § 300gg–13(a)(4)." (Motion For Preliminary Injunction, at 2 (Docket No. 14)).

The ACA, enacted on March 23, 2010, provides in pertinent part as follows:

(a) A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for–

* * *

(4) with respect to women, such additional preventive care and screenings not described in paragraph (1) as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph.

42 U.S.C.A. § 300gg-13(a)(4).

On August 1, 2011, the Health Resources and Services Administration ("HRSA") issued interim final regulations that outlined the preventive care and services for women required by the ACA, and created an exemption for certain religious employers. 76 Fed. Reg. 46621-01 (Aug. 3, 2011). The preventive care and services identified in the guidelines include well-woman visits, breastfeeding support, domestic violence screening, and "[a]ll Food and Drug Administration ["FDA"] approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity." Administrative Record ("A.R."), at 283-284. FDA-approved contraceptive methods include condoms, spermicides, oral contraceptives, intrauterine devices, and emergency contraceptives. A.R., at 402-03.

The interim final regulations defined "religious employer" as one that: (1) has the inculcation of religious values as its purpose; (2) primarily employs persons who share its

3

religious tenets; (3) primarily serves persons who share its religious tenets; and (4) is a non-profit organization under section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code. 76 Fed. Reg., at 46623. In final rules issued on February 15, 2012, the definition of "religious employer" was maintained, but a temporary enforcement "safe harbor" was created for non-grandfathered group health plans sponsored by certain non-profit organizations with religious objections to contraceptive coverage. 77 Fed. Reg. 8725, 8726-27 (Feb. 15, 2012). During the safe-harbor period, the government developed and proposed changes to the final regulations in an effort to "provid[e] contraceptive coverage without cost-sharing to individuals who want it and accommodat[e] non-exempted, non-profit organizations' religious objections to covering contraceptive services. . . " 77 Fed. Reg. at 8727. These final regulations, challenged by Plaintiffs here, were promulgated on July 2, 2013. 78 Fed. Reg. 39870-01 (July 2, 2013); 45 C.F.R. § 147.131; 26 C.F.R. § 54.9815-2713A; 29 C.F.R. § 2590.715-2713A.

Under the final rules, a "religious employer" is exempt from providing contraceptive coverage, and is defined as "an organization that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 45 C.F.R. § 147.131(a). That provision refers to "churches, their integrated auxiliaries, and conventions or associations of churches" and "the exclusively religious activities of any religious order." 26 U.S.C. § 6033(a)(3)(A)(i), (iii). The other criteria set forth in the interim regulations were not retained. This exemption for religious employers became effective on August 1, 2013. 78 Fed. Reg., at 39871.

In addition, the final rules provide that a group health insurer must expressly exclude contraceptive coverage from the group health plan coverage of "eligible organizations." 45

4

C.F.R. § 147.131(b), (c). An "eligible organization" is an organization that satisfies all of the following requirements:

> (1) The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 147.130(a)(1)(iv) on account of religious objections.
>
> (2) The organization is organized and operates as a nonprofit entity.
>
> (3) The organization holds itself out as a religious organization.
>
> (4) The organization self-certifies, in a form and manner specified by the Secretary, that it satisfies the criteria in paragraphs (b)(1) through (3) of this section, and makes such self-certification available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (c) of this section applies. The self-certification must be executed by a person authorized to make the certification on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of the Employee Retirement Income Security Act of 1974.

45 C.F.R. § 147.131(b).

A group health plan that receives such a self-certification must: (1) "[e]xpressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan;" and (2) "[p]rovide separate payments for any contraceptive services required to be covered . . . for plan participants and beneficiaries for so long as they remain enrolled in the plan." 45 C.F.R. § 147.131(c)(1), (2)(i). In addition, the insurer "may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or impose any premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries." 45 C.F.R. § 147.131(c)(2)(ii). The insurer is also required to "segregate premium revenue collected from the

5

eligible organization from the monies used to provide payments for contraceptive services." Id.[3]

The regulation governing the treatment of "eligible organizations" is to become effective for plan years beginning on or after January 1, 2014. 78 Fed. Reg., at 39871.[4] The exemption for "religious employers" became effective on August 1, 2013.

### III. Preliminary Injunction Standard

In determining whether to issue a temporary restraining order or a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure, the Court is to consider: (1) whether the movant has shown a strong or substantial likelihood of success on the merits; (2) whether irreparable harm will result without an injunction; (3) whether issuance of an injunction will result in substantial harm to others; and (4) whether the public interest is advanced by the injunction. Autocam Corp. v. Sebelius, 730 F.3d 618, 624 (6th Cir. 2013); Michigan State AFL-CIO v. Miller, 103 F.3d 1240, 1249 (6th Cir. 1997).

### IV. Analysis

A. Likelihood of Success on the Merits

1. RFRA

Under RFRA, government action may not "substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless it demonstrates that

---

[3] The insurer must provide plan participants and beneficiaries with "written notice of the availability of separate payments for contraceptive services" specifying that "the eligible organization does not administer or fund contraceptive benefits, but that the issuer provides separate payments for contraceptive services." 45 C.F.R. § 147.131(d).

[4] The Defendants indicate that the enforcement safe harbor has been extended such that Plaintiffs MQA and St. Mary Villa will not be subject to the regulations until August 1, 2014, and Plaintiffs Congregation and Aquinas College will not be subject to the regulations until September 1, 2014. (Docket No. 41, at 45).

6

application of the burden: (1) is in furtherance of a "compelling governmental interest;" and (2) is the "least restrictive means" of furthering that compelling governmental interest. 42 U.S.C. § 2000bb-1.[5] See Autocam, 730 F.3d at 625. "Exercise of religion" includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §§ 2000bb-2(4); 2000cc-5(7).

The Sixth Circuit recently explained the procedure for evaluating RFRA claims:

> RFRA provides that '[a] person whose religious exercise has been burdened ... may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government,' subject to the requirements of Article III standing. Id. § 2000bb–1(c). RFRA claims proceed in two steps. First, the plaintiff must make out a prima facie case by establishing Article III standing and showing that the law in question 'would (1) substantially burden (2) a sincere (3) religious exercise.' [Gonzales v.] O Centro Espirita, 546 U.S. at 428, 126 S.Ct. 1211. If the plaintiff makes out a prima facie case, it falls to the government to 'demonstrate[ ] that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.' Id. § 2000bb–1(b). The government carries the burdens of both production and persuasion when it seeks to justify a substantial burden on a sincere religious practice. Id. § 2000bb–2(3).

Autocam, 730 F.3d at 625.

The Supreme Court has described a "substantial burden" as one that "conditions receipt of an important benefit upon conduct proscribed by a religious faith" or "denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs. . ." Thomas v. Review Bd. of Indiana Employment Sec. Div., 450 U.S. 707, 717-18, 101 S. Ct. 1425, 1432, 67 L. Ed. 2d 624 (1981).

Plaintiffs argue that the regulations impose a substantial burden on their exercise of

---

[5] Because RFRA claims are similar to First Amendment claims, "the likelihood of success on the merits often will be the determinative factor" in analyzing whether a preliminary injunction should issue. Autocam, 730 F.3d at 624.

7

religion because they are required to: (1) trigger the facilitation of contraception services via self-certification; (2) contract with an insurer who will provide contraception services; (3) provide their insurer with the names of employees and dependents; and (4) sponsor a plan that will provide contraception services to their employees and dependents. Plaintiffs strongly urge the Court to adopt the decision of the District Court for the Western District of Pennsylvania in Zubik v. Sebelius, __ F.Supp.2d ___, 2013 WL 6118696 (W.D. Penn. Nov. 21, 2013) where the court found a RFRA violation based on similar arguments.[6]

    This Court is not persuaded by the reasoning of the Zubik decision. As for the Plaintiffs that are entirely exempt from contraceptive coverage, The Diocese and The Congregation, the regulations do not place any burden, much less a *substantial* one, on the exercise of their religious beliefs.

As for the remaining Plaintiffs, the Court is not persuaded that the act of self-certification "facilitates" the receipt of contraceptive services by their employees such that it imposes a substantial burden on their religious beliefs. Such a "burden" is too attenuated and speculative to be substantial.[7] The services to which the Plaintiffs object will only be provided in the event one

---

[6] Plaintiffs have also filed copies of the decisions in Legatus, et al. v. Sebelius, et al., No. 12-12061 (E. D. Mich. Dec. 20, 2013), Reaching Souls Int'l, Inc., et al. v. Sebelius, et al., No. 13-1092 (W.D. Okla. Dec. 20, 2013), Archdiocese of New York, et al. v. Sebelius, et al., No. 1:12-cv-02542 (E.D.N.Y. Dec. 13, 2013), Geneva College, et al. v. Sebelius, et al., No. 12-0207 (W.D. Pa. Dec. 23, 2013), and Southern Nazarene University, et al. v. Sebelius, et al., No. CIV-13-1015-F (W.D. Okla. Dec. 23, 2013) (Docket Nos. 59, 60, 62). The Defendants have filed copies of the decisions of Priests For Life v. U.S. Dep't of Health & Human Servs., No. 1:13-cv-01261-EGS (D.D.C. Dec. 19, 2013), University of Notre Dame v Sebelius, No. 3:13-cv-01276-PPS-CAN (N.D. Ind. Dec. 20, 2013), and Roman Catholic Archbishop of Washington v. Sebelius, No. 1:13-cv-01441-ABJ (D.D.C. Dec. 20, 2013). (Docket Nos. 58, 61).

[7] Although the Court accepts the Plaintiffs' determination that self-certification is at odds with their sincerely-held religious beliefs, the determination of whether those beliefs are

8

of their employees independently requests the services, and in the event such a request is made, the regulation prohibits any costs of those services, directly or indirectly, to be imposed on the Plaintiffs.[8] In other words, Plaintiffs bear no costs for the services and nothing is provided unless a third party employee independently requests the services from yet another third party – the insurer. It is only the independent actions of third parties that result in anyone obtaining contraceptive services. See Priests for Life, supra. Plaintiffs remain free to voice their opposition to the use of contraception services, and to discourage their use. But Plaintiffs' inability to prevent others from acting in contravention of Plaintiffs' religious beliefs does not constitute a substantial burden on those beliefs. For these reasons, self-certification does not put substantial pressure on the Plaintiffs to modify their behavior or violate their beliefs.

As for Plaintiffs' other arguments, the Court is not persuaded that requiring insurers to provide contraception services substantially burdens the Plaintiffs' religious beliefs simply

---

"substantially burdened" by self-certification is an objective one that RFRA requires the courts to make. In that respect, the Court disagrees with the analysis in Zubik, 2013 WL 6118696, at *14, 24-27, where the court found a RFRA violation by relying on the plaintiffs' testimony that self-certification would substantially burden their religious beliefs. Cf. Mersino Mgmt. Co. v. Sebelius, 2013 WL 3546702 (E.D. Mich. July 11, 2013)("As many courts have noted, permitting Plaintiffs to determine what constitutes 'substantial' and then insulating this proposition from challenge, impermissibly converts the 'substantial burden' requirement to an 'any burden' showing.") In a more recent opinion, the District of Columbia District Court was similarly unpersuaded by the Zubik court's analysis. Priests for Life v. U.S. Dep't of Health & Human Servs., No. 1:13-cv-01261-EGS (D.D.C. Dec. 19, 2013), slip op. at 24 n. 5 (Docket No. 58-1)(plaintiff cannot establish burden on exercise of religion is substantial "simply because he claims it to be so.")

[8]  In that regard, the consequences of self-certification are not unlike an employee's purchase of contraceptive services on his or her own, without any governmental involvement, by using a portion of the salary paid by Plaintiffs. The actions by any employee to obtain the disputed services are the proximate cause, or at a minimum the superseding cause, for them not the Plaintiffs' actions. After all, if no employee requests contraceptive services, none are provided.

9

because Plaintiffs have a contractual relationship with the insurers. And Plaintiffs have not shown that the act of providing a list of employees to their insurers is an additional obligation imposed by the regulations that substantially burdens their religious beliefs.[9] Plaintiffs must give the names of their employees to the insurance company anyway to get them covered by any insurance.

The Court concludes that Plaintiffs have not shown a likelihood of success as to their RFRA claim.

2. Free Exercise Clause

The Free Exercise Clause of the First Amendment prohibits Congress from making a law "respecting an establishment of religion, or prohibiting the free exercise thereof...." The protections of the Free Exercise Clause apply if a law "discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 532, 113 S. Ct. 2217, 2226, 124 L. Ed. 2d 472 (1993). In applying these protections, the Supreme Court has held that "a law that is neutral and of general applicability need not be justified by a compelling government interest even if the law has the incidental effect of burdening a particular religious practice." Id., at 531. A law that is not neutral and of general applicability "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." Id., at 531-32.

---

[9] Again, the Court disagrees with the Zubik court that providing employee names constitutes a substantial burden because it is analogous to providing a knife to a neighbor who seeks to use it to kill someone. 2013 WL 6118696, at 24-25. The flaw in the analogy is that it fails to account for all the independent actors involved. As discussed above, the names are provided to a third party insurer who only provides contraceptive services in the event another third party, the employee, requests those services.

10

A law is not neutral if the object of the law "is to infringe upon or restrict practices because of their religious motivation." Id., at 533. In determining the object of the law, the Court considers whether it is facially neutral. Id. A law that "refers to a religious practice without a secular meaning discernable from the language or context" is not facially neutral. Id. The Court also considers the intent expressed by the lawmakers in enacting the challenged legislation, and its operation. Id., at 534. In Lukumi, the Court determined that the city council's stated intention in enacting ordinances prohibiting animal sacrifice was to target the Santeria religion, and that the practices of the Santeria religion was the only conduct prohibited by the ordinances. Id., at 534-35.

A law is not one of general applicability if it "in a selective manner impose burdens only on conduct motivated by religious belief." Id., at 543. "The Free Exercise Clause 'protect[s] religious observers against unequal treatment,' . . . and inequality results when a legislature decides that the government interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." Id., at 542-43. In Lukumi, the Court concluded that the city's ordinances were not of general applicability because they pursued the city's interests in protecting public health and preventing cruelty to animals only against conduct motivated by the religious beliefs of those practicing the Santeria religion. Id., at 543-46.

Plaintiffs argue that the regulations at issue here are not neutral and of general applicability because they offer many secular exemptions, and do not create an exemption for "religious employers like Plaintiffs," and because they target Plaintiffs' religious practice of refusing to provide or facilitate access to contraception. (Docket No. 11, at 33).

The record before this Court, however, indicates that the regulations requiring

11

contraception services are neutral as they were not passed with the intent to target or burden any religious practices, but to advance the goals of safeguarding public health and ensuring that women have equal access to health care. See, e.g., 78 Fed. Reg., at 39872. The creation of an exemption for "religious employers" and of an accommodation for "eligible organizations" further evidences an intent, not to burden Plaintiffs' religious beliefs, but to recognize and respect them.

The Court concludes that the regulations are also generally applicable. The exemptions for grandfathered plans and religious employers, and the accommodations for eligible organizations, do not undermine the regulations' general applicability because, unlike the laws in Lukumi, they do not disfavor religion. See, e.g., Autocam Corp. v. Sebelius, 2012 WL 6845677, at *5 (W.D. Mich. Dec. 24, 2012), aff'd 730 F.3d 618 (6th Cir. 2013). See also Olsen v. Mukasey, 541 F.3d 827, 832 (8th Cir. 2008)("General applicability does not mean absolute universality."). Indeed, the "religious employers" exemption and the "eligible organizations" accommodation were created to recognize and respect Plaintiffs' religious beliefs, not burden them. Unlike the laws at issue in Lukumi, the contraception services requirement cannot be described as creating a burden "society is prepared to impose upon [the Plaintiffs] but not upon itself." Lukumi, 508 U.S. at 545-46.[10]

The Plaintiffs have not show a likelihood of success regarding their Free Exercise claim.

---

[10] Plaintiffs also argue that the regulations are subject to strict scrutiny because they implicate the "hybrid rights" of religious believers by burdening both their rights of speech and association. In Kissinger v. Board of Trustees of Ohio State Univ., 5 F.3d 177, 180 (6th Cir. 1993), the Sixth Circuit rejected these so-called "hybrid claims" as illogical and as unreasonably relying on dicta in Employment Div., Dept. of Human Resources of Oregon v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). Thus, the Court concludes that Plaintiffs have not shown a likelihood of success on the merits as to such a claim.

12

3. Free Speech Clause

The Supreme Court has held that "freedom of speech prohibits the government from telling people what they must say." Rumsfeld v. Forum For Academic and Inst. Rights, Inc. ("FAIR"), 547 U.S. 47, 61, 126 S.Ct. 1297, 1308, 164 L.Ed.2d 156 (2006). The Court has applied this prohibition to a requirement that school children recite the Pledge of Allegiance and to salute the flag, West Virginia Bd. Of Ed. v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed.2d 1628 (1943), and to a requirement that automobile owners in New Hampshire display the state motto – "Live Free or Die" – on their license plates. Wooley v. Maynard, 430 U.S. 705, 717, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977).

The Court has also applied this prohibition to situations in which the government forces one speaker to host or accommodate another speaker's message. Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc., 515 U.S. 557, 566, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995)(Court struck down requirement that parade, a unique form of expression, include a group whose message contravenes that intended by the organizer); Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal., 475 U.S. 1, 20-21, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986)(Court struck down requirement that utility company include the newsletter of a third party in its billing envelopes when it regularly included its own newsletter); Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 258, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974)(Court struck down requirement that newspaper permit a political candidate a right to equal space to reply to newspaper's criticism).

On the other hand, in FAIR, supra, the Court held that a requirement that law schools receiving federal funds offer military recruiters the same access to its campus and students that it

provides to nonmilitary recruiters did not unconstitutionally compel speech. In reaching its decision, the Court explained that the requirement "regulates conduct, not speech" and "neither limits what law schools may say nor requires them to say anything." 547 U.S. at 60. The Court also rejected the argument that the law schools could be viewed as endorsing the views of the military. Id., at 64-65. The Court concluded that students would be able to appreciate the difference between speech a school sponsors and speech the school permits because it is legally required to do so. Id. Finally, the Court rejected the argument that the requirement regulates "symbolic speech," like flag burning, as providing equal access to military recruiters is not "inherently expressive." Id., at 65-67.

Plaintiffs argue that the regulations compel them to express views with which they do not agree in violation of the First Amendment. Plaintiffs contend that this compulsion occurs in two different ways – by requiring them to provide, pay for,[11] and/or facilitate access to counseling relating to contraception services; and by requiring self-certification, which triggers an obligation on behalf of the insurer to provide contraception services.

The regulations at issue here do not resemble those condemned in the Court's compelled speech cases because they do not require the Plaintiffs to speak the government's message. The Plaintiffs remain free to convey to their employees and others their vehement objections to the use of contraceptive services, and nothing in the self-certification process restricts that freedom.

---

[11] Plaintiffs' argument that they are required to pay for or provide contraception services is not supported legally or factually. As explained above, the regulations do not require any of the Plaintiffs to provide or pay for contraception services. Indeed, the regulations clearly state that the insurance plans of "religious employers" are exempt from any requirement to provide contraception services, and the insurance plans of "eligible organizations" that self-certify are prohibited from imposing any direct or indirect cost for contraception services on the organization.

14

As with the regulation at issue in FAIR, the self-certification requirement neither limits what the Plaintiffs may say nor requires them to say anything. Id. In that regard, the self-certification requirement regulates non-expressive conduct, not the Plaintiffs' speech. See FAIR, 547 U.S. at 60. Indeed, the speech to which the Plaintiffs object is the speech of those who may provide counseling, which may or may not advocate the use of contraception services, to employees who may or may not seek such counseling. There is little likelihood the Plaintiffs will be viewed as endorsing the views of these third-parties.

Plaintiffs are unlikely to succeed on the merits as to their compelled speech claim.

4. Establishment Clause

The Supreme Court has explained that "[t]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." Larson v. Valente, 456 U.S. 228, 244, 102 S.Ct. 1673, 1683, 72 L.Ed.2d 33 (1982). In Larson, the Court invalidated a Minnesota statute that imposed special registration requirements on any religious organization that solicited more than 50% of their funds from nonmembers. 456 U.S. at 231–33. The Court concluded that the statute discriminated against religions, like the Unification Church, that depend heavily on soliciting donations from the general public. Id., at 253-255.

In Board of Ed. of Kiryas Joel Village School Dist. v. Grumet, 512 U.S. 687, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994), the Court held that the creation of a special school district for an area including a religious enclave violated the Establishment Clause by allocating political power based on religious criterion. See also Larkin v. Grendel's Den, Inc., 459 U.S. 116, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982)(Court struck down statute granting religious bodies veto power over liquor license applications on Establishment Clause grounds).

15

On the other hand, in Gillette v. United States, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971), the Court upheld a regulation recognizing an exemption from military service only for those objecting to "all wars," as opposed to those objecting only to a particular war, to an Establishment Clause challenge because it did not discriminate on the basis of religious affiliation or belief. See also Cutter v. Wilkinson, 544 U.S. 709, 723-24, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005)(Court upheld Religious Land Use and Institutionalized Persons Act (RLUIPA), which provides increased level of protection to prisoners' religious rights, to Establishment challenge, pointing out that RLUIPA does not differentiate among bona fide faiths).

Plaintiffs argue that the "religious employer" exemption violates the Establishment Clause of the First Amendment by creating a government-favored category of religious employers over other types of religious groups; and by creating an excessive entanglement between government and religion.

The distinction in the regulations between "religious employers" and "eligible organizations," however, applies equally to all religious denominations, and is based on the structure of the organization, not on its religious affiliation. The Plaintiffs have not shown that this distinction was intended to prefer, or results in a preference for, one denomination over another.

To the extent the Plaintiffs argue that the Establishment Clause prohibits distinctions between "houses of worship," on the one hand, and non-profit religious ministries, such as church-affiliated schools, on the other, they have cited no persuasive authority to support such a theory. In the case cited by Plaintiffs, Colorado Christian Univ. v. Weaver, 534 F.3d 1245 (10th

16

Cir. 2008) the Tenth Circuit struck down a Colorado law that provided scholarships to students attending any accredited state college – public or private, secular or religious – except those deemed "pervasively sectarian." But the distinction in "types of institutions" made in the Colorado law was based on the nature of the organization's religious beliefs and practices. The distinction challenged here is based on the organizations's structure, and does not require any inquiry into the organization's religious beliefs.

Plaintiffs also rely on <u>Weaver</u>, as well as the District of Columbia Circuit Court's opinion in <u>University of Great Falls v. National Labor Relations Board</u>, 278 F.3d 1335 (D.C. Cir. 2002), in arguing that the regulations create an "excessive entanglement" between religion and government. In <u>Univ. of Great Falls</u>, the court rejected the NLRB's test for applying the constitutional exemption for church-operated schools, which considered factors, such as the involvement of the religious institution in the daily operation of the school, the degree to which the school has a religious mission and curriculum, and whether religious criteria are used for the appointment and evaluation of faculty. 278 F.3d at 1339-40. The court concluded that such a test required an unconstitutional inquiry and entanglement into the religious mission of the school. <u>Id</u>, at 1342-43 ("Here too we have the NLRB tolling though the beliefs of the University, making determinations about its religious mission, and that mission's centrality of the 'primary purpose' of the University.") Instead, the court determined, the NLRB should consider only whether the educational institution: (a) holds itself out to students, faculty and community as providing a religious educational environment; (b) is organized as a nonprofit; and (c) affiliated with a recognized religious organization. <u>Id.</u>, at 1343-44.

The ACA regulations' definition of "religious employer" and "eligible organization" are

17

not unlike the three-part test adopted by the Univ. of Great Falls court.[12] Plaintiffs have not shown a likelihood of success on the merits regarding their Establishment Clause claim.

> 5. Religion Clauses

Finally, Plaintiffs argue that the regulations violate the Religion Clauses of the First Amendment by interfering with matters of internal church governance. Plaintiffs contend that the regulation artificially splits the Catholic Church in two and prevents it from exercising supervisory authority over its constituents in a way that ensures compliance with Church teachings. By permitting employees of the Plaintiffs that are "eligible organizations" to access free contraception services, the Plaintiffs argue that the regulation interferes with the ability of the Catholic Church to ensure that their religious affiliates remain faithful to Church teaching.

Plaintiffs rely on the Supreme Court's decision in Hosanna–Tabor Evangelical Lutheran Church & School v. Equal Opportunity Commission, ___U.S. ___, 132 S.Ct. 694, 181 L.Ed.2d 650 (2012) where the Court adopted the "ministerial exception" to employment discrimination statutes. In reaching its decision, the Court explained that the "ministerial exception" was grounded in the First Amendment, and "precludes application of [employment discrimination laws] to claims concerning the employment relationship between a religious institution and its ministers." 132 S.Ct. at 705. The Court concluded that "[r]equiring a church to accept or retain

---

[12] In contending that the regulations' definition of "religious employer" requires an unconstitutional inquiry into their bona fide religious status, the Plaintiffs rely on a 14-factor test applied by the United States Court of Federal Claims in determining whether an organization qualifies for tax-exempt church status under the Internal Revenue Code, 26 U.S.C. § 170(b)(1)(A)(i). Foundation of Human Understanding v. United States, 88 Fed. Cl. 203, 220 (Fed. Cl. 2009). Plaintiffs have not demonstrated, however, that this 14-factor test has been adopted as part of the ACA regulation defining "religious employer," or that it has been applied to them or any other organization under the ACA. Under these circumstances, it is unnecessary and inappropriate for the Court to consider the constitutionality of the 14-factor test.

an unwanted minister, or punishing a church for failing to do so. . . interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs." Id., at 706.

Unlike Hosanna-Tabor, the regulations at issue here do not purport to regulate Plaintiffs' internal structure; their hiring, firing or management of employees; or their ability to express their views to employees about contraception services. Furthermore, the regulations do not require employees to seek contraception services, they merely provide that the employees will not be required to pay for such services. As pointed out above, these same employees may currently obtain contraception services, without any government involvement, though they must use their own funds to do so. Plaintiffs' constitutionally-recognized right to their own internal governance is not implicated by the regulations.

Plaintiffs have not shown a likelihood of success on the merits as to their Religion Clauses claim.[13]

B. Other Factors for Injunctive Relief

As set forth above, the Court must also consider whether irreparable harm will result without an injunction; whether issuance of an injunction will result in substantial harm to others; and whether the public interest is advanced by the issuance of an injunction. Plaintiffs' arguments regarding these factors rely heavily on their contention that they are likely to succeed on the merits in establishing a violation of their First Amendment rights. For the reasons described above, the Court finds little likelihood that the Plaintiffs will succeed on the merits.

---

[13] Because the Plaintiffs have not raised the APA claim in their preliminary injunction briefs, the Court considers that claim waived for purposes of the preliminary injunctive motion.

19

On the other hand, the Defendants argue that there is no urgent need for injunctive relief as four of the seven Plaintiffs will not be subject to the new regulation until August 1, 2014 at the earliest. As for the other three, the Defendants argue that they waited roughly five months to file suit after the challenged regulations appeared in the Federal Register. Defendants also argue that injunctive relief will undermine the government's ability to achieve the goals underlying the enactment of the contraception services mandate, and consequently, will harm the third parties whom the legislation was designed to benefit.

Since the ACA does not violate the Plaintiffs' rights, there is no irreparable harm to Plaintiffs, and the public interest will not be advanced by the issuance of an injunction. Because no injunction is being issued, whether the issuance of an injunction will result in substantial harm to others is moot. For these reasons, the Court concludes that the remaining three factors do not weigh in favor of the Plaintiffs.

## V. Conclusion

Weighing all these factors, the Court concludes that Plaintiffs have not established that a preliminary injunction is warranted. Accordingly, Plaintiffs' Motion For Preliminary Injunction (Docket No. 14) is denied.

It is so ORDERED.

_____
TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE